UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TRACY L. CLARK,

               Plaintiff,

                                           Case Number 04-10364-BC
v.                                       Honorable David M. Lawson

AETNA LIFE INSURANCE COMPANY,

               Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO AFFIRM PLAN ADMINISTRATOR'S DECISION AND GRANTING PLAINTIFF'S MOTION TO REVERSE PLAN ADMINISTRATOR'S DECISION

The plaintiff, Tracy L. Clark, has brought this action against the defendant in its capacity as the administrator of an employee welfare benefit plan as defined by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, because it denied the plaintiff's application for long-term disability benefits. The plaintiff claimed that she could no longer perform her occupation as a customer service representative for Consumers Energy Company, where she worked from April 2000 to March 23, 2003, due to fibromyalgia, restless leg syndrome, temporomandibular joint syndrome (TMJ), and carpal tunnel syndrome. The parties dispute the standard of review to be applied by the Court and also contest the merits of the plaintiff's benefits application. The Court heard the arguments of the parties through their respective counsel in open court on September 1, 2005 and took the motions under advisement. The Court now finds that benefit plan calls for a *de novo* standard of review of the plan administrator's decision, and under that standard the plaintiff is entitled to benefits because, according to her physicians, she is unable to perform either her own or a reasonably related occupation because of disease. Therefore, the

Court will grant the plaintiff's motion to reverse the plan administrator's decision and deny the defendant's motion to affirm.

I.

The plaintiff, Tracy L. Clark, worked as a customer service representative for Consumers Energy (Consumers) in Alma, Michigan from April 15, 2000 until March 23, 2003, the date she claims she stopped working as a result of disabling fibromyalgia, TMJ, restless legs, and carpal tunnel syndrome. During her employment tenure, the plaintiff was responsible for taking gas and electric emergency calls, placing new service orders, various typing tasks, and collecting credit information. The plaintiff ultimately filed a claim for long term disability on December 6, 2003.

The defendant, Aetna Life Insurance Company (Aetna), administers Consumers' long-term disability plan. Under the plan, Consumers agreed to pay monthly benefits, after a waiting period, to employees who became totally disabled. The plan specifies:

### Benefit Qualification Period

You will qualify to receive Monthly Benefits after you are Totally Disabled for 270 calendar days. Until you qualify for Monthly Benefits, successive periods of Total Disability which arise from the same or a related cause will be considered as one period of Total Disability if they are separated by less than 31 calendar days of active work.

Once you have qualified for Monthly Benefits, successive periods of Total Disability which arise from the same or a related cause will be considered as one period of Total Disability if they are separated by less six months of active work.

### Total Disability

You will be considered to be Totally Disabled during the first 33 months of any period of disability if you are unable to perform your own occupation because of disease, injury or pregnancy-related condition. Thereafter, you will be considered Totally Disabled if you are unable to engage in any Reasonable Occupation because of disease, injury, or pregnancy-related condition. To be considered Totally Disabled, however, you must: (1) be under the care of a legally qualified physician,

-2-

(2) submit the required statement by your physician, and (3) upon request, have a physical examination by a physician designated and paid by the Insurance Company when and as often as it may reasonably require during the period for which you claim benefits. The Insurance Company has the right to require proof of your continued Total Disability.

AR 421-22.

The plan also contains the following proof-of-loss provision:

Section 6. Proof of Loss
Written proof covering the occurrence, the character, and the extent of disability must be furnished to the Insurance Company, within ninety days after the expiration of the qualifying period. Subsequent written proof of the continuance of such disability must be furnished to the Insurance Company at such intervals as the Insurance Company may reasonably require. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the employee, later than one year from the time proof is otherwise required. No action at law or in equity shall be brought to recover on this policy after the expiration of three years after the time written proof of loss is required to be furnished.

The Insurance Company shall have the right to require as part of the proof of claim satisfactory evidence (a) that the employee has made application for all Class II other income benefits referred to in Section 2 of Article II, (b) that he has furnished all required proofs for such benefits, (c) that he has not subsequently waived such benefits, and (d) of the amounts of all Class I and Class II other income benefits payable.

The Insurance Company at its own expense shall have the right and opportunity to have a physician it designates examine the person of any individual whose injury or sickness is the basis of claim when and as often as it may reasonably require during the period for which such individual claims benefits under this policy.

AR at 332.

On December 10, 2003, Virginia White-Linn, a nurse practitioner who had been treating the plaintiff since June 2003, completed an attending physician statement in support of the plaintiff's application for long-term disability benefits. Under the impairing diagnosis and treatment portion of the form, Nurse Linn listed fibromyalgia as her primary diagnosis of the plaintiff. In addition,

she diagnosed cronic pain, fatigue, and TMJ.  The form further noted that the plaintiff was taking Elavil, Inderal, Klonopin, and Ultram for her symptoms and  the plaintiff had undergone an appendectomy at the end of November 2003.

Nurse Linn checked under "abilities and limitations" section of the form the box that specified that the plaintiff had "No ability to work.  Severe Limitation of functional capacity; incapable of minimal activity" and commented that the plaintiff was "[u]nable to perform work." AR at 101.  Nurse Linn further indicated that the plaintiff could work "no" hours per day, she had placed work restrictions on the plaintiff between September 17, 2003 and February 1, 2004, and the plaintiff's estimated return-to-work date was unknown.  Finally, nurse Linn listed her objective findings with respect to the plaintiff as "[s]evere myalgia, fatigue, poor concentration, multiple tender joints but otherwise normal PE [physical examination].  Ord[ered] testing.  Being referred to pain management specialist." *Ibid.*

On January 13, 2004, Nurse Linn telefaxed Aetna her office notes taken during the course of her treatment of the plaintiff.  The plaintiff first saw Nurse Linn on June 26, 2003, at which time she noted:

> S. Mrs.  Clark is a 35 y/o woman, here today with chief c/o feeling tired and having muscle aches for the last six months.  States that the onset of these symptoms was slow but progressive and has continued now to the point where she's quite concerned.  It does seem to be affecting her quality of life.  She's not been previously evaluated by a healthcare worker for these symptoms.  States that her symptoms are fairly persistent, occasionally wake her up with body aches at night and she's unsure whether they get worse with activity but she thinks that they do in general.  She also c/o night sweats . . . .  States that she was recently diagnosed with TMJ and occasionally takes Motrin 800mg for her symptoms.  She does have headaches from the TMJ.  She also recently had dental work for 4 abscessed teeth.
>
> O. Mrs.  Clark appears to be somewhat uncomfortable.  She's in not acute distress. She's pleasant, cooperative.  Her skin is warm and dry, no obvious rashes or sores. . . . Head is nomocephalic atraumatic.  Her mouth mucosa is pink and moist, without

lesions.  Posterior pharynx is also without lesions.  Uvula is midline.  Tongue appears normal.  Eyes are without conjunctivitis or scleral icterus.  Neck is supple, without masses.  Thyroid does not appear to be large . . . .  Lungs CTA without any wheezes or crackles.  Resp are not labored.  Heart is RRR without murmur, gallops or rubs.  Abd bowel sounds are active in all 4 quads.  The are no brutis, abd soft, non-tender, non-distended, without masses.  No liver or spleen enlargement.  No CVA tenderness. . . . Extremities without edema or cyanosis.  Pulses are equal and 2+ Strength appears to be normal and equal bilaterally.  There is diffuse tenderness on palpation, no obvious swelling of her joints or redness.  Neurologic is grossly intact.  No obvious tremors, no weakness, no change in sensation to touch.

A.  Significant generalized fatigue and body aches over the last 6 mo. without any obvious physical findings.

AR at 133.  Nurse Linn's office notes indicate that she followed up with the plaintiff on July 2, 2003.  Nurse Linn noted that the plaintiff was "[h]ealthy appearing."  AR at 132.  The plaintiff apparently was able to move in the room without hesitation; however, the plaintiff complained of "tenderness w/deep palpation in the scapular areas bilaterally as well as thigh, deltoid muscles, and particularly the R hip."  *Ibid.*  Nurse Linn further commented that the plaintiff had "good ROM of her hips/knees w/no red, warm, or swollen joints.  No palpable cervical axillary notes."  *Ibid.*  Tests that Nurse Linn ordered after the plaintiff's initial visit were "non-diagnostic."  *Ibid.*  Based on this visit with the plaintiff, Nurse Linn opined that the plaintiff suffered from "[m]yalgias.  Possible sleep disorder.  Possible restless leg syndrome."  *Ibid.*  Consequently, Nurse Linn ordered a sleep study and gave the plaintiff a note releasing her from work until the end of July.

Nurse Linn again saw the plaintiff on July 31, 2003.  She noted that "[r]ecent PTH intact was normal.  ENT exam normal.  No palpable cervical nodes.  Lungs clear.  Heart reg. rhythm with no murmur.  No palpable lymphadenopathy.  She c/o tenderness in the subscapular, biceps, gluteal areas."  AR at 131.  Nurse Linn wrote that the plaintiff suffered from "[m]yalgias with fatigue;

probable fibromyalgia; worsening of headaches." *Ibid.*  Nurse Linn gave the plaintiff a slip to be off

work until August 24, 2003.

On August 21, 2003, the plaintiff called Nurse Linn.  Nurse Linn noted that the plaintiff

> is still struggling with a lot muscle pain . . . . She states that it is so painful in the a.m.
> that when she wakes up it sometimes brings her to tears.  We did refer her to Dr.
> VanCise, who seems to confirm the diagnosis of some fibromyalgia and is pursing
> some headache-type complaints. . . . She has been unable to work; states she spends
> a good majority of the day sitting and is feeling increasingly depressed.
>
> A.  Myalgias, etiology still unknown.
>
> P.  We're going to continue with her off-work through Sept 19.  We'll make
> arrangements for some PT . . . to see if they might provide some supportive comfort
> measures.

AR at 130.  The plaintiff followed up with Nurse Linn on September 17, 2003.  Nurse Linn recorded

that

> [s]he's not been to work now for a couple of months.  Reports that she can now get
> up, help her kids get off to school, and by 10 a.m. is so achy and fatigued that she
> needs to sit down.  She's not doing any of the cooking at home, rarely running
> errands.  States she can only go upstairs to the upstairs bedroom once a day. . . .
> Tracy is trying to walk around the block at least once or twice a day.  Reports that
> this fatigues her tremendously.  She's attempting to do some simple ROM exercises
> at home.

*Ibid.*  Nurse Linn further noted that the plaintiff had gained ten pounds in the last six weeks, was "a

little teary eyed" when the plaintiff spoke about her pain, maintained good eye contact, had no red,

swollen, or tender joints, and complained of muscle tenderness in "her extremities and in the

scapular areas." *Ibid.* Nurse Linn's assessment was "fibromyalgia w/significant pain/fatigue." *Ibid.*

Nurse Linn's final entry in the administrative record is dated December 8, 2003.  AR at 129.

She wrote that because of insurance problems, the plaintiff had changed primary care physicians.

 The plaintiff's new physician had sent her to a rheumatologist, and that specialist performed

-6-

extensive laboratory and cat scan tests. The rheumatologist apparently agreed with the diagnosis of fibromyalgia. Otherwise, Nurse Linn recorded that the plaintiff had underwent an appendectomy, was doing some light cooking, and was trying to "force herself to walk 15 minutes a d[ay]." *Ibid.* Walking and doctors appointments exhausted the plaintiff and caused her pain to the point of tears. Nurse Linn also noted that the plaintiff had gained twenty-six pounds in the last three months, the plaintiff flinched in pain "to palpation in post-occipital, sub-scapular, low-back area," and Phalens and Tinel's were positive on the right with "paresthesias of her 1st and 2nd finger." *Ibid.* Finally, Nurse Linn wrote that she had reviewed the plaintiff's records from the rhuematologist, "which indicate[d] that she's had a normal CT of the Abd, Chest, and Pelvis, normal CA 125, and CEA; normal HLA, B27." *Ibid.*

On December 30, 2003, the defendant requested the plaintiff's medical records from Dr. Carla Guggenheim, the plaintiff's rheumatologist. Dr. Guggenheim's office notes reflect that the plaintiff first saw her on September 29, 2003 for fatigue, muscle and joint pain, and night sweats. According to the notes, the plaintiff's symptoms started on December 24, 2002

> with viral illness consisting of sever [sic] diarrhea. Started having symptoms in bilateral hands and shoulders right more than left. Noted mainly stiffness and pain with little swelling. Also aching back and leg pain from the knee down. Rated as 9/10. Has one good day a week whilst the rest are miserable. Exacerbated with household activities like vacuuming and walking. Taking a bath or lying down. Motrin 800s doesn't touch it. Was on Vicodin in 3/03 with little help. Elavil help [sic] 5 %. Ultram doesn't help whatsoever. Chills, no fever (max 99.6), Weight gain around 30lbs secondary to inactivity. Night sweats. TB skin test negative 8/03. She has had livedo for a long time, but is not sure how long her palms have been red. Off work since June 6 because of pain.

AR at 116.

A "review of systems" indicated that the plaintiff had "occasional blurry vision, [n]o mouth ulcers or sores." *Ibid.* The plaintiff had a rash on her arms and neck in January of 2003, but the rash

-7-

resolved.  The plaintiff did not suffer from wheezing or chest pain.  She complained that she was nauseated at times, suffered from headaches, and noticed nipple discharge "for one year clear, yellow, white[.]"  *Ibid.*  Prolactin, however, was "normal 2 weeks ago."  *Ibid.*  Dr. Guggenheim further recorded that the plaintiff had fibromyalgia, and underwent three C-sections, a tuba1 ligation, and ganglion cyst removal from her wrists.  A family history of breast cancer, cancer, and fibromyalgia also was noted.

Dr. Guggenheim's notes indicate that she performed a physical examination of the plaintiff. The results of the examination reflected:

> Weight: 185, 11/90, 80,
> Head and Neck: PERLA, EOMI
> No mouth sores or ulcers, No Lns in the neck area
> Chest: CTA Bilaterally
> Abdomen: soft, Normal BS
> Limbs:  no adema and decreased TP and DP Pulses, Livido reticularis, palmar erythema
> MSK: Limited Abd, ER and IR of both shoulders
> Tenderness in bilateral elbows and R MCP of thumb.  Bilateral ankles and midtarsal. Tender Achilles Tendon, shins.  No synovitis or limited ROM of joints
>
> LABS: Pap smear 2 weeks ago negative, CT Brain and CXR within normal.  Due for mamogram through her PCP, CBC, CMP, ESR, ANA, TSH, PTH, CRP, SPEP, Adolase within normal

*Ibid.*  Dr. Guggenheim assessed that the plaintiff suffered from "polyarthraglia, achilles tendonitis, palmar erythema, livedo reticularis: suspect unidentified underlying problem." AR 117.  She ordered a "chest CT, RF, HLA B27, pelvic US." *Ibid.*  The plaintiff was to take Prednisone and return the following week on Thursday.  *Ibid.*

Dr. Guggenheim's next entry was recorded on October 9, 2003.  The notes reflect that the Prednisone previously prescribed helped the plaintiff's hand pain, but not the tendonitis.  The plaintiff complained of chills, fatigue, sleep interruptions from pain, daytime drowsiness, blurry

-8-

vision, ear pain, dizziness, tinnitus, difficulty breathing with exertion, blue hands in cold,

palpitations, irregular heart beat, diarrhea, heart burn, lethargy, excessive thirst, headache,

depression, weak and tingly ring finger tips, and dry mouth. Dr. Guggenheim further noted "phalen

is positive on right, tinels negative on right. Marked livedo on legs. No synovitis in hands. Achilles

tendons are still tender." AR at 115. According to the entry, the plaintiff had not undergone the

"Pelvic US" test, but the other tests "HLA b 27 . . . RF . . . protein C, S. AT III, homocysteine" were

negative or within normal range. *Ibid.* Dr. Guggenheim recommended an increase in Prednisone

and seemed worried "about underlying malignancy and will change order to CT chest, abdomen,

pelvis." *Ibid.* She also wrote "Early carpal tunnel right: I will send her to OT." *Ibid.*

The plaintiff returned to Dr. Guggenheim again on October 22, 2003. The office notes state:

> **OBJECTIVE**: 192#, 108/70-80-16.  Normocephalic, neck supple with no
> lymphdenopathy. No oral lesions, except cold sore externally. Salivary pool good.
> Lungs clear with occasional harsh, loose cough. Heart with RRR. Shoulders with
> limited ROM in flexion, no peripheral synovitis. Hips with FROM, painful in
> external rotation bilaterally. No pretibial edema. Knees with FROM. Gower's test
> negative. SLR negative but painful at endpoint. Marked livedo on legs.
>
> **LABS**: 10/13/03-Abdomen, pelvis and chest CTs unremarkable.
>
> **ASSESSMENT/ PLAN**: polyarthralgia: I have both fortunately and unfortunately
> not found a cause of her problems. COAG panel was not completed. I reordered
> today. I recommend she wean prednisone . . . then stop it. She is to call me with any
> problems. We may have to taper the steroids more slowly.

AR at 114. The plaintiff last visited Dr. Guggenheim on November 25, 2003. Office notes indicated

that "none of her symptoms have changed except the fatigue is overwhelming." AR at 113. Dr.

Guggenheim opined that

> I think this is primary fibromyalgia and restless leg: I recommend she continue
> walking, but increase it to 20 min a day and add range of motion exercise. I
> recommend she try ROM Dance (from the Arthritis Foundation), or gentle Yoga.
> She was advised to exercise and work through discomfort. She is on a reasonable

-9-

> medicine regimen.  She could try the Mayo Clinic Fibromyalgia program.  I think
> Cleveland Clinic also has a program.  But it's expensive and insurance does not
> cover.  She should expect to go back to work.  She will look into these programs.  A
> second rheumatology eval should be done in those institutions as well.

AR at 113.

Over two months after Dr. Guggenheim stopped treating the plaintiff, Laura Double, a nurse

employed by Aetna, spoke with the rheumatologist.  Double summarized the January 30, 2004

conversation in a note found in Aetna's records as follows:

> I appreciate the time you took to return my call today.  We discussed the fact that
> Ms. Clark had applied for long term disability benefits based on her complaints of
> fatigue and pain felt due to fibromyalgia.  You indicated that you were not the
> provider that took her out of work and that you do not believe that a person with
> fibromyalgia should be out of work on disability.  Her treatment should consist of
> lifestyle changes and limiting her activities would not be appropriate . . . . You have
> provided no restrictions or limitations on Ms. Clark's activities and do not support
> her remaining out of work for any duration due to a disabling condition.

AR at 143.

A week after that conversation, Aetna denied the plaintiff's claim for long-term disability.

In a letter dated February 6, 2004, the company wrote:

> We have completed our review of your Aetna Long Term Disability claim and have
> made a final determination regarding your benefit eligibility. We are unable to
> approve your claim for benefits.
>
> To qualify for . . . benefits during the first 24 months you must be unable, solely
> because of injury or disease[,] to perform the material duties of your own occupation.
>
> You submitted a long-term disability claim application for consideration of benefits.
> You indicated on your employee statement that you were unable to work due to
> Fibromyalgia, TMJ, Restless Legs and Carpal Tunnel Syndrome.  On January 30,
> 2004 we had a telephone conversation with your rheumatologist Dr. Guggenheim.
> Dr. Guggenheim stated during our conversation that she does not support you being
> out of work.
>
> . . .

-10-

Dr. Guggenheim also indicated that your last office visit with her was in November of 2003.

Consequently, at this time we do not have sufficient medical information supporting disability through your qualifying period and beyond to be considered eligible for long-term disability benefits.

It is our opinion that in light of the above information, you are not disabled from performing the material duties of your own occupation and therefore you do not meet the definition of long-term disability contained in your policy as stated above. We have no alternative but to deny any and all liability on your claim for benefits.

AR at 149-51. The letter also provided that if the plaintiff disagreed with the denial of benefits, she was entitled to appeal the decision.

On July 28, 2004, the plaintiff through counsel appealed her denial of benefits. Additional medical records were submitted. The appeal letter reads, in relevant part:

At the point Dr. Guggenheim was contacted by Aetna, she had not seen Ms. Clark for two months, and then immediately discharged Ms. Clark from her practice. Even the Aetna correspondence of January 30, 2004 reports that Dr. Guggenheim was not the physician who took Ms. Clark off from work. Apparently, Dr. Guggenheim does not believe anyone with Fibromyalgia should be off work on disability. After Aetna's contact, Dr. Guggenheim wrote an addition on the November 25, 2003 office note (without seeing Ms. Clark) and then discharged [her]. Clearly, Dr. Guggenheim's opinion can no longer be accepted as she has not seen Ms. Clark in eight months and is no longer providing care or treatment.

The February 6, 2004 correspondence does not indicate whether Aetna contacted the physician who actually took Ms. Clark off work regarding the restriction. Ms. Clark's family physician has been the St. Louis Family Clinic, P.C. In December 2003, Ms. Clark was referred to Marvin Neil Bleiberg, M.D. by her family treater. A copy of the records from the St. Louis Family Clinic, P.C., are attached. On March 1, 2004, the Clinic wrote to Aetna Life Insurance Company and confirmed that Ms. Clark was unable to return to work. The records maintained by the Clinic confirm Ms. Clark's disabled status, continuing her off work status through today's date.

Dr. Bleiberg has provided treatment to Ms. Clark since January 8, 2004. [His attached notes] clearly set forth the doctor's treatment plan. This includes a regimen of medications that include Inderal, Ultram, Klonopin, Elavil, Duragesic patch, and Neurontin. The doctor reported on the 2-11-04 office note that it was his medical

-11-

opinion that Ms. Clark is not able to tolerate even sedentary work in her current physical condition due to cognitive and physical deficits and significant pain. The doctor also felt Ms. Clark was unable to drive. . . .

Dr. Bleiberg has referred Ms. Clark for a number of consultations. Several initial reports are attached. Michael J. LaRouere, M.D., diagnosed Ms. Clark with Menire's disease. Treatment for this condition is ongoing and records regarding this treatment will be provided as soon as they are available.

Finally, the regimen of medication that Ms. Clark currently uses would not allow her to meet the requirement of her employer set forth in Consumer's Energy's Fitness for Duty Policy. Clearly, the drugs taken limit Ms. Clark's ability to drive, function, and perform her work at Consumer's Energy. Ms. Clark is currently totally disabled. Both the health care providers now treating Ms. Clark have determined that she is unable to work. Please review Aetna's position.

AR at 152.

As part of the appeals process, the plaintiff also submitted a letter from Nurse Linn. Nurse Linn wrote that the plaintiff was under the care of Dr. Blieberg and that the plaintiff was "so uncomfortable that she is unable to walk up a flight of stairs to access her children's rooms. Her husband has taken over most of the household chores and shopping type activities." AR at 162. Nurse Linn further recounted:

On exam, she has normal deep tendon reflexes with negative Homan's sign. Her cranial nerves were grossly intact. She does have decreased range of motion of the cervical spine with complaint of pain as well as decreased range of motion in the lumbar spine. She is able to extend her upper extremities to about 90 degrees before there's pain. She has decreased muscle strength in her arms bilaterally with decreased grip strength. The are no red, warm joints an no muscle atrophy.

. . .

Patient states that she can't sit for greater than one hour without discomfort, that her walking is quite limited, and the combination of her pain and pain medications has decreased her ability to focus. I do not think that she is able to return to work at the present time, although it is my hope that we will be able to get her involved in some conditioning activities, decrease her medication, and hopefully return her to work on at least a part-time basis.

-12-

*Ibid.* The medical records from Dr. Bleiberg state that he first examined the plaintiff on January 8, 2004 during which time he completed, among other things, a physical examination. That examination revealed

> that the patient is a well-developed, well-nourished, white female, in no acute distress. . . . Respirations are non-labored. Radial pulses are intact. Skin is well-hydrated.
>
> Deep tendon reflexes were 2 + at the bilateral biceps, triceps, brachiordialis, patellar tendons and Achilles tendon. The plantars were downgoing bilaterally. There was no clonus to either ankle . . . . There was negative Hoffmann bilaterally.
>
> Cranial nerves . . . are grossly intact. Extraocular muscles were intact. Speech was fluent, coherent and comprehensible. The patient was alert and oriented at all times three. Siting and standing balance was within normal limits. There was no nystagmus appreciated. The rate of speech, volume of speech, articulation of speech, coherence of speech and spontaneity of speech were within normal limits.
>
> Range of motion of the cervical spine was limited by 50% in all planes, with complaints of pain in all planes. Rang of motion of lumbar spine was limited by 50% . . . . Range of motion of the bilateral shoulders, elbows, wrists, hips, knees, and ankles were within functional limits. There was no instability or crepitus appreciated, but there was pain produced during range of motion of all of the joints.
>
> . . .
>
> The patient was able to heel to toe walk without difficulty. Gait was within normal limits.

AR at 197.

Based on his examination, Dr. Bleiberg diagnosed post viral syndrome, fibromyalgia, cervicalgia, thoracic spine pain, lumbargo, numbness and tingling in the right upper limb, tinnitus, and balance dysfunction. He suggested that the plaintiff see a number of specialists and commented:

> I believe that the pain needs to be treated. The functional deficits need to be treated. We also need a thorough work-up in order to make sure nothing has been missed and if there is a treatable cause in the case, that we go ahead and treat it in a timely fashion. She has had a very thorough work-up in the past. I would just like to make

sure that nothing else has been missed.   The specific individuals that I have
recommended with regard to consultation may have additional information to add.

AR at 199.

On January 27, 2004, the plaintiff again saw Dr. Bleiberg.  At that point, the plaintiff had not

seen the specialists Dr. Bleiberg had recommended; she was debating whether to seek treatment at

the Mayo Clinic.  During the visit, Dr. Bleiberg performed an electrodiagnostic study.  He found:

> Today's electrodiagnostic study of the cervical region and the upper limbs revealed
> evidence for mild right carpal tunnel syndrome.  There was no electrodiagnostic
> evidence for cervical radiculopathy or upper limb neuropathy.

AR at 202.  The plaintiff followed up with Dr. Bleiberg on February 16, 2004.  The plaintiff reported

a pain level of seven to eight out of ten and numbness and tingling in the left arm and both wrists.

Dr. Bleiberg further recorded: "She is sleeping better and through the night.  She states that physical

therapy seems to provide pain relief for approximately four to five hours afterward. . . . She is unable

to drive."  AR at 204.  Despite what appeared to be some reports of improvement, Dr.  Bleiberg

opined that the plaintiff was unable to work.  He wrote:

> It is of [sic] my medical opinion that she would not be able to tolerate even sedentary
> work in her current physical status.  Due to her cognitive and physical deficits and
> significant pain status.  She is unable to even drive.  She does not even rest well.

AR at 205.

Dr.  Bleiberg's next entry came on March 10, 2004.  Notes from his physical examination

of the plaintiff on that date state:

> I performed a comprehensive physical examination.  The pertinent positives did
> reveal that she was uncomfortable throughout the exam.  Hyperrflexia is present at
> bilateral biceps, triceps, brachioradialis, patella and Achilles tendons.
> Approximately 50% limitation is present during cervical flexion, extension, rotation
> and side bending bilaterally.  Pain was experienced in all planes. The same
> limitations are present throughout the lumbosacral range of motion at approximately
> 50%  throughout all planes with pain experienced.  Pain is experienced to all 18

-14-

> fibromyalgia tender points; however, she also experiences several areas of her body which are not classified by the American Rheumatolgic Association.  These areas to include, anterior thigh, abdomen, calves, scalp etc.  She is essentially tender to touch on any area of her body whatsoever.

AR at 207.  Otherwise, Dr.  Bleiberg felt the plaintiff "needs to be at least walking on an every single day basis."  He considered enrolling the plaintiff in aquatic therapy "and transition her to land therapy in hopes to improve overall day to day function."  *Ibid.*  According to Dr. Bleiberg, "[r]esearch has shown, by implementing and enhancing an exercise regiment to improve, not only endorphin, but cortisol levels is key in reducing fibromyalgia symptomatology."  *Ibid.*

On April 8, 2004, Dr.  Bleiberg again met with the plaintiff.  He wrote in his notes that "she did see the infectious disease doctor, the ear physician, and the neurologist."  *Ibid.*  At the time, the plaintiff reported to Dr.  Bleiberg that the ear specialist had diagnosed Menier's disease "and had some hearing loss in the right ear."  *Ibid.*  The plaintiff was undergoing further work-up and was to call the infectious disease doctor to set up testing.   On April 23 and 28, 2004, Dr. Bleiberg performed "trigger point injection in an attempt to get her some relief of her pain symptoms there." AR at 211. On April 28, 2004, Dr. Bleiberg noted that the plaintiff

> continues with pain and palpable trigger points in the lumbar paraspinal musculature which has been resistant to conservative treatment to date, including medication and therapy.  She underwent trigger point injections about the scapula/shoulder on 4/23/04 and had a good response with substantial improvement in pain.  These injections are indicated in order to improve her pain and improve her overall function.

AR at 212.  After the procedure on April 28, 2004, the plaintiff "noted a substantial improvement in her pain, not only in the lumbar region, but also radiating down the limbs after the injection."  *Ibid.*

-15-

In addition to Dr. Blieberg's records, the plaintiff submitted the records of Dr. Michael J. LaRouere, her ear specialist, for consideration on appeal. The plaintiff treated with Dr. LaRouere on February 11, 2004. His notes record:

> The patient gives approximately a one-year history of fluctuating hearing loss with associated tinnitus and fullness. The tinnitus is nopulsatile in nature. She also complains of occasional left ear popping. . . . It is very characteristic for Meniere's, lasting ten minutes or so approximately three times a week with true vertigo sensation, lightheadedness and nausea.
>
> . . .
>
> | | |
> |---|---|
> | Right Ear: | Tympanic membrane and external auditory canal are clear; auricle normal. |
> | Left Ear: | Tympanic membrane and external auditory canal are clear; auricle normal. |
> | Nose: | External nose normal; nasal airway clear. |
>
> . . .
>
> | Balance Tests: | Fudka: | No turning tendency. |
> |---|---|---|
> | | Romberg: | Normal. |
> | | Head Shake: | Right-beating nystagmus with delayed reversal with left-beating nystagmus. |
> | | Frenzel's Exam: | No spontaneous or gaze evoked nystagmus. |

> AUDIOGRAM (2/10/04): Mildly asymmetric sensorineural hearing loss, left ear greater than right. Right with low-frequency sensorineural hearing loss.

AR at 219. Dr. LaRouere's impression was Meniere's disease.

The plaintiff further submitted her medical records from Dr. Vilma Drelichman, an infectious disease specialist. That doctor assessed "[d]ouble vision associated with numbness and tingling of the lower extremities, myalgias, muscle aches. Differential diagnosis will be some muscle disease particularly polymyositis associated with muscle weakness, muscle pain. History of rash as well." AR at 222.

-16-

A treating neurologist, Dr. Brian Kirschner, also provided records for Aetna's consideration. He reviewed an MRI scan of the plaintiff's brain and found it to be normal. He summarized his examination as follows:

> In summary. Tracy has numerous complaints following a questionable viral illness a year ago. She has diffuse complaints of pain almost everywhere she is touched to the point where she is receiving a fentanyl patch. While many of tenders spots are consistent with fibromyalgia, she also reports tenderness in the parts of the body not typically tender in patients with this condition. In addition, she admits to symptoms that are nonphysiologic such as itching when I scratched the surface of her fingernails. This raises a question of the validity of many of her symptoms. She did fairly well on the bedside mental status testing. Most of the abnormalities seemed to be due to inattentiveness. She was able to recall objects with category cue, which is not suggestive [of] an underlying memory disorder. She does complain of some balance difficulty but showed no evidence of ataxia on examination today. There is nothing to suggest myclopathy. Brain imaging was unremarkable and there is nothing to suggest demyelinating disease. . . . [H]er medications could be greatly contributing to her sleepiness and fatigue.

AR at 227.

On May 21, 2004, the plaintiff underwent a psychological examination by Dr. Janette S. Caputo. In her notes, Dr. Caputo recorded the plaintiff's daily activities. According to Dr. Caputo's records, the plaintiff wakes at seven, makes lunch for her son, and supervises her children as they prepare for school. Her husband takes the children to school, and the plaintiff lets the dogs out. She eats a light breakfast and lies on the couch until 2:00 p.m. The plaintiff generally attempted one chore such as a load of laundry or sweeping the floor. The plaintiff picked up her children at 4:30 p.m., but had to lie down when she got home. She drew a bath for her son at 7:30 after dinner prepared by her husband. Thereafter, she returned to the couch or may go directly to bed.

Dr. Caputo further observed that the plaintiff had driven herself to the appointment and was on time. *Ibid.* Dr. Caputo noted that the plaintiff "appeared mildly to moderately lethargic,

-17-

slouching in a chair, occasionally repositioning herself for comfort. Several times she needed to stand to alleviate pain. She rose slowly but steadily from her chair and her gait was unremarkable." AR 245. The plaintiff's contact with reality was, in Dr. Caputo's assessment, "good." *Ibid.* The plaintiff "is independent for self-care and needs assistance with domestic chores and maintenance of her business." *Ibid.* During the examination, the plaintiff was "spontaneous. There were no signs of blocked emotions, pressured speech, or circumlocution. Her conversation was logical, coherent, complex, and abstract." *Ibid.* Emotionally, the plaintiff "was moderately labile, [became] tearful when asked about her pain, about her family, and about her experiences through the diagnostic process." *Ibid.* Dr. Caputo wrote that the plaintiff's mood was "depressed, and affect consistent with mood." Ibid.

Finally, Dr. Caputo performed a series of sensory and memory tests. Based on the examination and tests, Dr. Caputo diagnosed "major depressive disorder, single prolonged episode, severe without psychotic features," and "pain disorder associated with both psychological factors and a General Medical Condition." AR at 247. The plaintiff's prognosis, Dr. Caputo opined, was "currently guarded. Involvement with a pain psychologist is strongly recommended . . . .Treatment of insomnia should be considered as much as priority as treatment of pain and depression." *Ibid.*

On September 13, 2004, Aetna sent the plaintiff's medical records to a physician it had retained for evaluation: board-certified psychiatrist, Dr. Mark Schroeder. The portion of the administrative record to which the defendant cites, however, appears to be some sort of internal, computer-based note keeping system maintained by the company. *See* AR at 28. The actual report of Dr. Schroeder is not contained in the record. The defendant noted two conclusions by Dr. Schroeder:

-18-

1. The information in the record is unclear as to whether the employee experienced symptoms of depression when she left work on 3-24-03. Nurse practitioner Ms. White-Lin[n] stated that the employee presented with depressive symptoms in 6-03; the employee reported to Dr. Caputo that her depression began in 'early 2003.' The available information does not substantiate the presence of severe depression or other severe psychiatric illness, or impairment, that would reasonably have prevented the employee from working at her occupation.

2. The available record does not indicate that the employee has received treatment from a mental health specialist since she left work, which does not support that the employee has been receiving 'regular and appropriate care' from a mental health provider . . . .

AR at 28-29.

Aetna upheld the denial of the plaintiff's claim on appeal in a letter dated September 17, 2004. Again, the actual letter is not part of the record; instead, it appears to be recorded verbatim in the defendant's internal computer notation system. Certain portions of the letter are covered by post-it notes, and it is difficult to decipher the exact language. The legible portion of the letter reads in relevant part:

On appeal, you submitted numerous medical records consisting of Gratiot Community Hospital records dated July 2003 through December 2003; Sparrow Regional Laboratory Dated July 2003 through October 2003; Quest diagnostics dated February 2003 through June 2003; Virginia White-Linn, FPN records dated July 2003 through February 2004; Dr Guggenheim records dated September 2003 though February 2004; Sean Cabbage, PA student office notes dated January 2003 through December 2003; Michigan Spine & Pain records date January 2004 through June 2004; Michigan Spine & Pain physical therapy progress noted dated January 2004 through April 2004; Dr. LaRouere report dated February 10, 2004; Dr. Drelichman report dated March 18, 2004; Dr. Kirschner report dated February 18, 2004; Dr. Medel report dated July 27, 2004; Dr Caputo medical report dated May 21, 2004; Dr. Bleiberg report dated January 27, 2004 and Central Michigan Community Hospital records dated April 2004. This information as well as Ms. Clark's claim file has been reviewed on appeal.

. . .

The attending physician statement completed by Virginia White-Linn . . . stated that Ms. Clark is unable to work. In a January 30, 2004 call with our medical consultant,

-19-

Dr. Guggenheim stated that she could not find a cause for Ms. Clark's complaints. Dr. Guggenheim indicated . . . that Ms. Clark has fibromyalgia but that not working wasn't the answer. She stated that Ms. Clark was overweight and smoked and that lifestyle changes were what she needed. She went on to state that Ms. Clark does not have a rheumatic condition and when asked said that she might start with a psychiatric evaluation and lifestyle changes. Dr. Guggenheim did not feel that Ms. Clark should be out of work and dismissed her from care on February 13, 2004.

Ms. Clark first began treating with Dr. Bleiberg on January 8, 2004. She had an [MRI] of the brain on January 20, 2004. She has been to physical therapy three times a week. Dr. Bleiberg stated in his February 11, 2004 report that Ms. Clark could not tolerate sedentary work due to her physical and cognitive deficits and significant pain status. He recommended that she see a pain psychologist for depression related to chronic pain. Our medical consultant reviewed the medical information in Ms Clark's file and determined that Ms. Clark has been diagnosed with Fibromyalgia in the absence of other systemic conditions to account for her symptoms, multiple tender points, and complaints of disturbed sleep and generalized fatigue.

. . . [Portion blocked by post-it notes]

Her other medical diagnoses of Meniere's disease and periodic leg disorder should not affect her ability to perform sedentary work.

Ms. Clark was also diagnosed with major depression. Our psychiatrist consultant reviewed the information in Ms. Clark's file and determined that Ms. Clark has reported an inability primarily due to fatigue, pain, depression, cognitive impairment, possible sleep disorder and sedating side effects medication. The medical records from June 26 though April 28, 2004 occasionally noted Ms. Clark's self report of such symptoms. Her providers did not document that she had appeared drowsy, or that she had difficulty with comprehension or communication, though these records did not provide a detailed mental health evaluation. In many of these evaluations, Ms. Clark was documented as providing a detailed personal history. Rheumatoglist Dr. Guggenheim recommended on November 25, 2003 that Ms. Clark return to work while other providers did not specifically address her ability to work.

In the evaluation dated February 18, 2004, neurologist, Dr. Kirschner, questioned the validity of Ms. Clark's complaints because of "inconsistencies on neurological and cognitive tests," and concluded that "I doubt she has an underlying cognitive disorder." Although he stated that it was possible that she may have cognitive deficits due to medication or poor sleep, he did not identify any such deficits. In a psychological evaluation dated May 21, 2004, Dr. Caputo opined that Ms. Clark suffered from a severe major depressive disorder and that her prognosis was guarded. However, the examiner noted that she had not reviewed any medical records; and the

observed mental status exam showed no severe signs of illness. Thus, her conclusions appear to have been based on Ms. Clark's self report alone. Dr. Caputo did not give an opinion about Ms. Clark's ability to work, and did not identify any specific restrictions or limitation. Ms. Clark's poor performance on simple cognitive tests presents as inconsistent with her overall presentation, which included the ability to respond relevantly to a detailed personal history. These inconsistencies were not addressed by the examiner, nor were issues of potential symptom exaggeration or secondary gain.

The information in the file does not indicate that . . . Ms. Clark has been treated by a mental health specialist since she left work. Our psychiatric consultant concluded that the available information does not document severe psychiatric symptoms (such as suicidal or homicidal thoughts with intent or plan, psychotic or manic symptoms, or panic attacks with agoraphobia. There is no evidence of significant observed signs of illness (such as marked deficits in organization of thought, cognition, communication, motor function or hygiene); or evidence of specific psychiatric limitations. Inconsistencies in the performance on cognitive tests suggested response bias. The fact that the available information does not indicate that since Ms. Clark has received treatment from a mental health specialist since she left work, does not support that she was suffering from a severe mental disorder. In summary our psychiatric consultant concluded that the available information does not substantiate the presence of a severe, impairing psychiatric illness.

According to the Department of Labor Dictionary of Occupational Titles . . ., Ms. Clark's occupation of customer service representative, utilities, is classified as sedentary. . . . It is reasonable that Ms. Clark would be able to take frequent breaks from repetitive and continuous activities involving the use of her right upper extremity. Based on the information in Ms. Clark's file, she would not be precluded from performing her own occupation with restriction and limitation of taking frequent breaks.

AR at 15-16, 18-26.

Thereafter, the plaintiff filed a complaint in the Gratiot County, Michigan circuit court challenging Aetna's denial of benefits initially and on appeal. On December 29, 2004, Aetna removed the matter to federal court because ERISA governed the denial of benefits. The parties subsequently filed cross-motions for judgment on the administrative record, and the Court heard oral argument on the motions on September 1, 2005.

-21-

II.

The plaintiff challenges the denial of benefits under Section 502(a)(1)(B) of ERISA, which authorizes an individual to bring an action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  She contends that the Court should review the administrative record *de novo*, a point disputed by the defendant, who contends that the more deferential arbitrary and capricious standard should govern.

"[A] plan administrator's decision is reviewed 'under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933 (6th Cir. 2000) (quoting *Firestone*, 489 U.S. at 115).  If the plan contains a discretionary grant, the Court applies the more deferential arbitrary and capricious standard of review.  *Ibid.*

Whether a benefits plan grants discretionary authority is determined by reference to the plan's specific language.  The Sixth Circuit has repeatedly held that no "magic words" or "incantation" of the phrase "discretionary authority" are required to trigger the lower standard. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 (6th Cir. 1998); *Hoover v. Provident Life Ins. Co.*, 290 F.3d 801, 808 (6th Cir. 2002).  Rather, the Supreme Court has counseled lower courts "to focus on the breadth of the administrators' power – their 'authority to determine eligibility for benefits or to construe the terms of the plan.'" *Perez*, 150 F.3d at 557 (quoting *Firestone*, 489 U.S. at 115). Although the use of certain terminology is not necessary to vest discretion and thereby trigger the

-22-

arbitrary and capricious standard, the plan nonetheless must contain "a clear grant of discretion [to the administrator] to determine benefits or interpret the plan." *Ibid.*

The Sixth Circuit has found that when the language of the plan states that a claimant must furnish proof satisfactory to the insurance company for the determination of benefits, the plan vests discretionary authority in the plan administrator. *See Perez*, 150 F.3d at 558.  In *Perez*, the plan at issue stated:

> Written proof of total disability must be furnished to [Aetna] within ninety days after the expiration of the [first twelve months of disability]. Subsequent written proof of the continuance of such disability must be furnished to [Aetna] at such intervals as [Aetna] may reasonably require. . . .
>
> [Aetna] shall have the right to require as part of the proof of claim satisfactory evidence . . . that [the claimant] has furnished all required proofs for such benefits.

*Ibid.*  On appeal from the district court's grant of summary judgment, the plaintiff argued that the plan failed to specify to whom the proof had to be satisfactory and therefore did not grant discretion sufficient to trigger the more deferential standard of review.  The court of appeals rejected this argument, reasoning:

> Although the case before us today presents a slight variation, our conclusion that the Plan vests discretion in Aetna follows naturally from our prior Sixth Circuit decisions addressing similar plan language cases. In *Miller*, we applied *Firestone* and held that the language 'on the basis of medical evidence satisfactory to the Insurance Company' clearly vested discretion in the plan administrator. *Id*. at 983-84. In *Yeager*, we extended *Miller* and held that the language 'satisfactory proof of Total Disability to us' also clearly vested discretion in the plan administrator. *Yeager [v. Reliance Standard Life Ins. Co.*], 88 F.3d [376, 380 (6th Cir. 1996)]. The district court in *Yeager* had found this contractual language ambiguous because it was unclear whether the phrase 'to us' modified 'submits' or 'satisfactory proof of Total Disability.' *Id*. at 381. The district court held that this absence of explicit contractual language meant that the plan administrator had not clearly been granted discretion under the plan. *Id*.
>
> . . .

-23-

> The panel in *Yeager* reached the only reasonable interpretation of the language at issue in that case when the panel concluded that 'it would not be rational to think that the proof would be required to be satisfactory to anyone other than [the insurance company].' This case presents an issue identical to the one presented in *Yeager*. In reaching the same conclusion as the panel in *Yeager*, we reaffirm that decision today. Given that the Plan clearly grants Aetna discretion to make benefits determinations, we have no occasion to reach the second en banc issue; whether the de novo standard of review announced in Firestone applies to the factual determinations made by Aetna.

*Id.* at 557-58.

By contrast, the Sixth Circuit has found plan language that simply requires proof of disability without more fails to vest discretion in the plan administrator. *See Hoover*, 290 F.3d at 808. In *Hoover*, the plan language stated:

> PROOF OF LOSS
> If the policy provides for periodic payment for a continuing loss, you must give us written proof of loss . . . .
> TIME OF PAYMENT OF CLAIMS
> After we receive written proof of loss, we will pay monthly all benefits then due you for disability. Benefits for any loss covered by this policy will be paid as soon as we receive proper written proof.
> RESIDUAL DISABILITY/RECOVERY BENEFITS
> We can require any proof which we consider necessary to determine your Current Monthly Income and Prior Monthly Income

*Ibid.* Relying on *Perez*, the district court construed this language as a clear grant of discretionary authority. However, the court of appeals reversed, reasoning:

> The requirement that the insured submit written proof of loss, without more, does not contain 'a clear grant of discretion [to Provident] to determine benefits or interpret the plan.' *Perez*, 150 F.3d at 557 (citations omitted). *Id.* The policies do not expressly state that the administrator has discretion over the determination of residual benefits, nor is there language requiring 'satisfactory' proof of a disability. Instead, the policies permit Provident only to require proof to determine financial loss. Even if we were to assume that this language vested discretion in Provident, it would apply only to proof of lost income. The language relied on by Provident in no way equals a grant of discretion in determining whether Hoover suffers from a medical condition rendering her unable to work. Absent such a grant of discretion,

-24-

Provident's determinations regarding Hoover's residual disability benefits should have been reviewed de novo.

Further, we reject the idea that Provident reserved itself discretion by providing that it may require physical examinations at its own expense. The policies do not provide any discretion in the review of these examinations, nor do they require that the results of the examinations provide adequate evidence that the insured is disabled.

*Ibid.*

The Aetna plan language in this case, quoted earlier, defines "total disability" in terms of the inability to perform one's own occupation for the first thirty-three months, and any other "reasonable occupation" thereafter. The inability to work must be the result of "disease, injury, or pregnancy-related condition." Aetna requires the applicant to satisfy three conditions: "(1) be under the care of a legally qualified physician, (2) submit the required statement by your physician, and (3) upon request, have a physical examination by a physician designated and paid by the Insurance Company when and as often as it may reasonably require during the period for which you claim benefits." AR at 421-22. The plan contains no requirement that the applicant satisfy any particular standard of proof, but only that the three conditions be met. However, Aetna has reserved to itself the right "to require proof of your continued Total Disability." *Ibid.*

The provision relating to proof of loss is phrased in terms of deadlines and time limits, not the quality of proof. AR at 332 ("Written proof covering the occurrence, the character, and the extent of disability must be furnished to the Insurance Company, within ninety days after the expiration of the qualifying period"). The only reference to proof that must "satisfy" Aetna is contained in the following provision:

The Insurance Company shall have the right to require as part of the proof of claim satisfactory evidence (a) that the employee has made application for all Class II other income benefits referred to in Section 2 of Article II, (b) that he has furnished all

-25-

required proofs for such benefits, (c) that he has not subsequently waived such benefits, and (d) of the amounts of all Class I and Class II other income benefits payable.

The Insurance Company at its own expense shall have the right and opportunity to have a physician it designates examine the person of any individual whose injury or sickness is the basis of claim when and as often as it may reasonably require during the period for which such individual claims benefits under this policy.

*Ibid*.

The Court believes that the language at issue here more closely resembles the plan in *Hoover* and is not analogous to the provisions in the plans examined in the *Perez* line of cases. In this case, although an applicant must submit a statement of disability from a doctor, there is no language that suggests that proof of disability must satisfy Aetna independently that the condition is disabling. Under the provision defining total disability, the plan states the company has the right to require proof of continuing disability, but a fair reading of that provision aligns that proof with the fulfillment of the original three conditions: being under a qualified doctor's care, providing a written statement by the doctor, and submitting to an examination by Aetna's doctor. Absent from the language is an indication that the proof must be satisfactory or otherwise meet some stated criterion of Aetna. Under section 6, the portion of the plan requiring a claimant to furnish proof of loss, the plan again does not ask for proof sufficient to the insurance company; it merely asks for "[w]ritten proof covering the occurrence, the character, and the extent of disability must be furnished [periodically] to the Insurance Company, within ninety days after the expiration of the qualifying period." AR at 332.

The defendant contends that a clear grant of discretion exists because the company has the right to require proof of continued total disability and written proof covering the occurrence, character, and extent of disability in intervals determined by Aetna, and that benefits will only be

-26-

paid subject to proof of claim. As the court in *Hoover* noted, however, subjecting a claim of long-term disability to submission of written proof without more is insufficient. *Hoover*, 290 F.3d at 808 (holding that "[t]he requirement that the insured submit written proof of loss, without more, does not contain 'a clear grant of discretion . . .to determine benefits or interpret the plan.").

The court in *Perez* based its finding on explicit language providing that proof had to be satisfactory, implying that it was *the insurance company* that must be satisfied despite the absence of such specific designation. *Perez*, 150 F.3d at 558 (reasoning that "it would not be rational to think that the proof would be required to be satisfactory to anyone other than [the insurance company]"). In this case, the language provides only that proof must be *provided* to the insurance company. There is therefore no language to suggest that Aetna has the discretion to interpret the plan or perform any other function other than collecting written proof, determining whether the treating physician is "qualified," and demanding periodic physical examinations by physicians of its own selection to verify continuing disability.

Because there is no "clear grant of discretion [to the plan administrator] to determine benefits or interpret the plan," *Perez*, 150 F.3d at 557, the Court finds that plan administrator's decision denying benefits in this case must be reviewed *de novo*. *Firestone*, 489 U.S. at 115; *Shelby County Health Care Corp.*, 203 F.3d at 933.

III.

The *de novo* standard requires the reviewing Court to "determine whether the administrator made a correct decision." *Hoover*, 290 F.3d at 808-809. Thus, "the administrator's decision is accorded no deference or presumption of correctness." *Ibid.* Based on the record before the plan

-27-

administrator, "the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Ibid.*

[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." *Firestone*, 489 U.S. at 115. As noted earlier, the plan in this case requires the plaintiff to prove that she is "unable to perform [her] own occupation because of disease, injury or pregnancy-related condition" for the first thirty-three months of her disability period, and is "unable to engage in any Reasonable Occupation because of disease, injury, or pregnancy-related condition" thereafter. AR at 421-22. This disabling condition must be established by a "qualified physician" who is treating the plaintiff and who has submitted a written "statement." To determine whether the plaintiff has made the required showing, the court generally considers only that evidence presented to the plan administrator at the time he or she determined the employee's eligibility in accordance with the plan's terms. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). The court's review thus is limited to the administrative record. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998). However, "[t]he administrative record in an ERISA case includes all documentation submitted during the administrative appeals process because this information was necessarily considered by the plan administrator in evaluating the merits of the claimant's appeal." *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 511 (6th Cir. 2005) (citing *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005)).

There is no serious dispute that the plaintiff has been diagnosed with fibromyalgia, restless leg syndrome, TMJ, carpal tunnel syndrome, and depression. The defendant argues, however, that there is no objective evidence of these ailments and there is no proof that these conditions actually

rendered the plaintiff unable to perform her own job, which was sedentary, and all other reasonable work.

Over the course of treatment, the plaintiff underwent several tests.  Some positive findings were recorded.  For example, Dr. Bleiberg confirmed the presence of mild carpal tunnel syndrome in the plaintiff's right hand through an electrodiagnostic study.  AR at 204.  In addition, a sleep study confirmed that the plaintiff suffered from restless leg syndrome.  AR at 271.  Finally, tests performed by Dr. LaRouere indicated that the plaintiff suffered from mild hearing loss and Minier's disease.  AR at 221.

Other tests, however, were unremarkable or within normal limits.  On July 2, 2003, Nurse Linn wrote that the tests she had ordered were "non-diagnostic."  AR at 132.  On July 31, 2003, Nurse Linn noted that "[r]ecent PTH intact was normal.  ENT exam normal."  AR at 131.  Nurse Linn further commented that she reviewed the test results ordered by Dr. Guggenheim.  *Ibid.* According to Nurse Linn's records, the tests indicated "she's had a normal CT of the Abd, Chest, and Pelvis, normal CA 123, and CEA; normal HLA, B27."  AR at 129.

Dr Guggenheim's notes confirm Nurse Linn's interpretation of the test results.  AR at 114. In addition, Dr. Guggenheim office notes indicate "[p]ap smear 2 weeks ago negative, CT Brain and CXR within normal."  AR at 116.  Moreover, "protein C, S, AT II, homocysteine" were negative or within normal range.  *Ibid.*  Dr. Kirschner, the neurologist, ordered an MRI.  The results of that test similarly were negative: "Brain imaging was unremarkable and there is nothing to suggest demyelinating disease."  AR at 227.

Although the objective test results may appear to be equivocal, it appears from the record that the plaintiff's main complaint was pain associated with activity, which Nurse Linn and Dr.

Bleiberg attributed to fibromyalgia.  That disease has been said to constitute a diagnosis by limitation.  *See Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817-18 (6th Cir.1988) (observing that, "[a]s set forth in the two medical journal articles . . . fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. . . . [I]t is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients").  Although the complaints of pain associated with this disease are generally subjective, "fibromyalgia [is] medically determinable and that the presence of certain symptoms, including the presence of focal trigger points, may be sufficient to establish the diagnosis."  *Gaffney v. Comm'r of Soc. Sec.*, 277 F. Supp.2d 733, 736 (E.D. Mich. 2003).

Dr. Bleiberg did "medically determine" the presence of findings that supported the diagnosis of fibromyalgia.  He stated in his report of a March 10, 2004 examination:

> Pain is experienced to all 18 fibromyalgia tender points; however, she also experiences several areas of her body which are not classified by the American Rheumatolgic Association.  These areas to include, anterior thigh, abdomen, calves, scalp etc.  She is essentially tender to touch any area of her body whatsoever.

AR at 207.  On April 28, 2004, he noted that the plaintiff

> continues with pain and palpable trigger points in the lumbar paraspinal musculature which has been resistant to conservative treatment to date, including medication and therapy.  She underwent trigger point injections about the scapula/shoulder on 4/23/04 and had a good response with substantial improvement in pain.  These injections are indicated in order to improve her pain and improve her overall function.

AR at 212.  However, it appears from the record that the relief was short-lived.  Neurologist Dr. Brian Kirshner also found that the plaintiff's "tender spots" were "consistent with fibromyalgia," although she complained of pain elsewhere as well.  AR at 227.

-30-

As noted earlier, Dr. Bleiberg concluded that the plaintiff could not perform any work.  AR at 205 ("It is of my medical opinion that she would not be able to tolerate even sedentary work in her current physical status.  Due to her cognitive and physical deficits and significant pain status [sic].  She is unable to even drive.  She does not even rest well.")  Nurse Linn also concluded that the plaintiff's pain prevented her from performing sedentary work:

> Patient states that she can't sit for greater than one hour without discomfort, that her walking is quite limited, and the combination of her pain and pain medications has decreased her ability to focus.  I do not think that she is able to return to work at the present time, although it is my hope that we will be able to get her involved in some conditioning activities, decrease her medication, and hopefully return her to work on at least a part-time basis.

AR at 162.

The defendant contends that this proof is insufficient to establish disability under the plan because these opinions are based only on the plaintiff's subjective complaints of pain, and other physicians, specifically Dr. Guggenheim, do not believe that the plaintiff's fibromyalgia pain is disabling.  However, the Sixth Circuit has found that subjective complaints of pain may be sufficient to support a claim of disability, at least in the Social Security context.  *See Glass v. Sec'y of Health, Educ. & Welfare,* 517 F.2d 224, 225 (6th Cir. 1975).  The Second Circuit has applied that same concept to disability claims governed by ERISA.  *See Connors v.  Connecticut General Life Ins. Co.*, 272 F.3d 127, 136-37 (2d Cir. 2001) (stating that "the District Court erred in discounting Connors's complaints of pain as merely 'subjective.'  It has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability.' . . . While a district court reviewing an administrator's decision de novo is not required to accept such complaints as credible . . . it cannot dismiss complaints of pain as legally insufficient evidence of disability").  The Court finds that subjective complaints of pain can be sufficient to establish

disability under the terms of the plan now before the Court, which simply requires proof of "disability," as the plan defines that term, certified by a qualified physician who furnishes a written statement.

In concluding that the plaintiff's pain is not disabling, the defendant relies heavily on the statements of Dr. Guggenheim. In it's post-appeal denial letter, the defendant stated that "Dr. Guggenheim recommended on November 25, 2003 that Ms. Clark return to work while other providers did not specifically address her ability to work." AR at 15. That statement is inaccurate on two counts: Dr. Guggenheim did not recommend on November 25 that the plaintiff return to work; rather, on that date she recommended that the plaintiff consult the Mayo Clinic Fibromyalgia program and noted that "she should expect to go back to work." AR at 113. Second, as noted above, other physicians commented specifically on the plaintiff's ability to work.

The defendant's main focus on Dr. Guggenheim, however, centers on the conversation that the defendant's nurse had with the doctor after treatment had terminated. In that conversation, Dr. Guggenheim allegedly expressed her opinion that *no person* "with fibromyalgia should be out of work on disability." AR at 143. That statement does not constitute an individualized assessment of the plaintiff's ailments or abilities to perform the functions of her job, however. It provides little insight into the plaintiff's condition, although it speaks volumes about the doctor's skepticism about a disease that is difficult to diagnose. The Court believes, therefore, that the comment does not deserve much weight as to the claim of disability in this case.

The defendant's denial apparently was based in part also on a review by an unnamed medical consultant. *See* AR at 22 (stating that "[o]ur medical consultant reviewed the medical information in Ms Clark's file and determined that Ms. Clark has been diagnosed with Fibromyalgia in the

-32-

absence of other systemic conditions to account for her symptoms, multiple tender points, and complaints of disturbed sleep and generalized fatigue"). That consultant, however, did not examine the plaintiff and confined his or her contact with the case to a review of the written records. The Court finds that this consultant's opinion ought not to outweigh the opinions of Dr. Bleiberg and Nurse Linn, both of whom had hands-on contact with the plaintiff. *See McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 170 (6th Cir. 2003) (noting that "[t]he evidence presented in the administrative record did not support the denial of benefits when only [the administrator]'s physicians, who had not examined [the claimant], disagreed with the treating physicians"); *see also Kalish*, 419 F.3d at 508 (stating that "[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician").

The defendant also points out that its psychiatric consultant was critical of Dr. Caputo's conclusions concerning the diagnosis of depression, and in all events Dr. Caputo never tied the plaintiff's depression to an inability to work. Although these arguments may be accurate, the Court finds that the principal cause of the plaintiff's disability is the pain she reports that is associated with movement and prolonged sitting. The plaintiff did treat for depression, but the primary cause of her inability to perform her own job or other sedentary work has its roots in her fibromyalgia, discussed above.

The Court believes that any reasonable consideration of the record compels the conclusion that the plaintiff has complied with the requirements of the plan to establish an entitlement to long-term disability benefits. She was under the care of a qualified physician who submitted a written

-33-

statement that established that the plaintiff was unable to perform her own occupation or other sedentary work because of disease.  The defendant did not ask her to submit to a physical examination, so that requirement plays no role in the decision.  Dr. Bleiberg and Nurse Linn have furnished information that describes the plaintiff's condition in terms that are consistent with the plan requirements for establishing disability.  The Court finds, therefore, that the plaintiff is entitled to long-term disability benefits under the plan administered by the defendant.

IV.

The Court concludes that a *de novo* standard of review applies in this case.  Under that standard, the Court finds that the plan administrator made an incorrect decision in denying benefits. Based on the record before the plan administrator, the court that the plaintiff is entitled to benefits under the plan.

Accordingly, it is **ORDERED** that the plaintiff's motion to reverse denial of long-term disability benefits [dkt # 12] is **GRANTED**.

It is further **ORDERED** that the defendants' motion for judgment [dkt # 11] is **DENIED**.

It is further **ORDERED** that the plaintiff shall submit a form of judgment to counsel for the defendant and the Court on or before October 3, 2005.

s/David M. Lawson                    
DAVID M. LAWSON
United States District Judge

Dated: September 26, 2005

-34-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 26, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS